Dorothy G. ADAMS, et al.

v.

GATES LEARJET CORPORATION.

C.A. No. 4–86–782–E.

United States District Court,
N.D. Texas,
Fort Worth Division.

May 12, 1989.

See also, 711 F.Supp. 1374.

Victoria C. Swanson, Schaden, Heldman & Lampert, Denver, Colo., Ralph Modad, Houston, Tex., for plaintiffs.

Dan Horn, John Moore and Wallace E. Maloney, Maloney & Smith, Dallas, Tex., and Stephen P. Kenney and David J. Adams, Lord, Bissell & Brook, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

MAHON, District Judge.

Ripe for adjudication is Defendant Gates Learjet Corporation's motion to dismiss or, alternatively, for summary judgment.

## Fact Summary

The Plaintiffs are past or present owners or operators of Learjet Model 24 aircraft. Learjet is the designer and manufacturer of all Model 24 Learjets. None of the Plaintiffs' aircraft have suffered any injury resulting from accident or traumatic damage. Rather, the Plaintiffs seek to recover alleged losses resulting from mandated modifications required by the Federal Aviation Administration's (FAA) issuance of Airworthiness Directive 84–17–02.

The FAA has exclusive authority to certify aircraft for sale in the United States. A type certificate is required before an aircraft manufacturer can put its product into the stream of commerce. A type certificate is issued when the FAA finds that "no feature or characteristic makes it [the aircraft] unsafe for the category in which certification is required." 14 C.F.R. § 21.21. The FAA issued a type certificate for the Learjet Model 24 on March 17, 1966. Hence, the FAA found, that the Model 24 met the standards for certification then in existence. Airworthiness Directives (AD's) are issued under the authority of federal statute and are mandatory orders to owners and operators of type certified aircraft to inspect, modify, or impose operating limitations as determined by the FAA.[1]

On June 13, 1980, the FAA commissioned a special certification review team to review the basis for the type certification of the Learjet 20 series. On July 11, 1980, the FAA advised Learjet that its re-examination of the certification disclosed numerous unsatisfactory conditions or deficiencies in the design of the Learjet 20 series. Specifically, with respect to this case, the FAA found that: (1) the Model 24 did not comply with Federal Aviation Regulation (FAR) 25.1505 regarding nosedown, high-speed runaway trim requirements; (2) the autopilot system had not been adequately tested; (3) a quick and positive disengagement of the autopilot servo had not been provided contrary to FAR 25.1329; and, (4) the fault analysis in the electrical system was insufficient.

Learjet was notified that the FAA intended to issue an AD on the pitch trim and autopilot system of the Model 20 series. Learjet, at the request of the FAA, developed an "Aircraft Modification Kit" to accomplish the changes. The hardware for the Model 25 kits were developed by May of 1981; but, it was not until February of 1984 that the Model 24 kits became available. The pitch trim and autopilot AD (number 84–17–02) for the Model 24 was published as a final rule by the FAA in the September 6, 1984 issue of the *Federal Register*.

Although AD 84–17–02 was issued on September 6, 1984, it was not effective until October 5, 1984. Modifications required under AD 84–17–02 had to be completed within 18 months after its effective date, or April 5, 1986 (completion date). The cost for each modification of Model 24 was estimated by the FAA and Learjet to be approximately $50,175.00, including Learjet's estimate of three weeks downtime to accomplish the modification.

On October 3, 1986, the Plaintiffs filed this action, seeking damages for the cost of complying with AD 84–17–02, the lost use of the aircraft while modifications were effected, and the diminution in the value of the aircraft. The Plaintiffs in this action spent between $31,000.00 and $52,000.00 to have the AD modifications made to their aircraft, exclusive of downtime costs. Some Plaintiffs were unable to afford the required AD modifications and sold their aircraft at losses between $187,990.00 and $265,000.00.

The Plaintiffs' cause of action, as set forth in their second amended complaint, consists of five claims. First, Plaintiffs allege that Learjet was negligent in the design and manufacture of the Model 24's pitch trim and autopilot systems. Another thrust of the Plaintiffs' negligence claim is that Learjet negligently misrepresented certain relevant facts to the FAA to obtain type certification. Second, the Plaintiffs assert a negligence per se claim contending that Learjet violated federal safety regulations in the process of the obtaining Model

1. *See* 14 C.F.R. §§ 21.00, 39.1–39.13.

24 type certification. Third, the Plaintiffs allege a fraud claim, contending that Learjet intentionally or recklessly made false misrepresentations to the FAA that the Model 24 pitch trim and autopilot systems were adequately and safely designed. Fourth, the Plaintiffs allege that Learjet, in the sale of the Model 24's, breached an implied warranty that the aircraft were merchantable and fit for their intended purpose. Finally, the Plaintiffs contend that Learjet violated the Texas Deceptive Trade Practices Act (DTPA) by employing misleading acts to maintain the type certification of the Model 24 aircraft and failing to disclose pertinent information concerning the Model 24's at the time of their sale to four Plaintiffs.

Learjet moves for summary judgment on several grounds. Learjet argues that the Plaintiffs' unintentional tort claims must fail because the Plaintiffs' summary judgment pleading and proof present only "economic losses" as damages, compensable only under contract law, not tort. As to the Plaintiffs' fraud claim, Learjet argues that no evidence exists of a material misrepresentation made by Learjet to the FAA or its agents during the type certification process. Alternatively, assuming a misrepresentation was made, Learjet argues that it was directed to the FAA; hence, the FAA relied to its detriment, not the Plaintiffs. And, as if these beguiling attacks on the Plaintiffs' claims were not enough, Learjet raises the specter of a limitations as a bar to all of the Plaintiffs' claims.

Because the Court finds the limitations argument persuasive, it need not analyze Learjet's alternative grounds for summary judgment. The Plaintiffs claims are time barred.

### Analysis

1. *Limitations Issues are Procedural: Texas Law Applies*

By an Order dated August 9, 1988, the Court made the choice of law determination that the law of Kansas controls this controversy. When confronted with a suit in which the substantive law of another jurisdiction applies, Texas courts apply the relevant Texas statute of limitation. This principle arises from the theory that the foreign state's statute of limitations is most often part of its procedural, rather than substantive, law. This Court, sitting in diversity jurisdiction, must act as a Texas court would. While the law of Kansas will control the substantive issues, Texas law will control the Court's determination of the limitation issues. *See, e.g., Ellis v. Great S.W. Corp.*, 646 F.2d 1099, 1111 (5th Cir.1981).

2. *The Legal Injury*

Texas applies a two-year statute of limitations for tort actions such as negligence and fraud.[2] The Plaintiffs were thus required to bring their fraud and negligence claims "not later than two years after the day" their cause of action accrued. Tex. Civ.Prac. & Rem.Code § 16.003 (Vernon 1986).

> Against the theory of the basic rule— that a right of action accrues in the plaintiff with the defendant's breach of duty, although "damage" ... does not result until sometime later—one must consider the qualifying proposition that "an action for negligence cannot be maintained unless *some* damage has resulted therefrom." *Johnson v. Sovereign Camp, W.O.W.*, 125 Tex. 329, 83 S.W.2d 605, 608 (1935) (emphasis added). The apparent contradiction is explained by the "legal injury rule."

*Zidell v. Bird*, 692 S.W.2d 550, 554 (Tex. App.—Austin 1985, no writ).

Under the legal injury rule, "the plaintiff's cause of action accrues when the defendant's conduct first becomes unlawful as to the plaintiff under the law applicable to the circumstance of the case." *Id.* As the *Zidell* court noted, the distinctions in this area are often imprecise and difficult to reconcile. *Id.*

---

**2.** *See, e.g., Coastal Distrib. Co. v. NGK Spark Plug Co.*, 779 F.2d 1033, 1038 (5th Cir.1986) (fraud); *Fusco v. Johns–Manville Prod. Corp.*, 643 F.2d 1181, 1183 (5th Cir.1981) (negligence). *See also* Tex.Civ.Prac. & Rem.Code Ann. § 16.003 (Vernon 1986).

In this case, the Plaintiffs have only plead and presented summary judgment proof of economic damages. Under these circumstances, a determination when Learjet's alleged conduct afforded the plaintiffs an "immediate remedy to redress harm to [their] legally protected interest[s]" is problematic if not impossible. As the Plaintiffs incurred damages compensable only under contract law, no unintentional tort claim appears to have yet accrued, despite the Plaintiffs' protestations that they were required to make costly modifications or sell their aircraft at greatly diminished prices. Damages compensable under the Plaintiffs' negligent design or misrepresentation claims could arise only from injuries caused by a sudden, traumatic occurrence.[3] But here it is undisputed that none of Learjet's alleged negligent acts resulted in a disaster, such as a Model 24 crash causing bodily injury or an unanticipated loss of property. The type of losses indicated by the Plaintiffs' summary judgment proof are those that can be protected by a properly negotiated and bargained for warranty clause. Therefore, the Plaintiffs have failed to demonstrate a legal injury resulting from Learjet's alleged negligence.

■ Assuming, without deciding, that the Plaintiffs *have* presented significant probative evidence of tort damages result-

ing from Learjet's alleged negligent or fraudulent acts, then the Plaintiffs' legal injury occurred at the time during the design and certification of the Model 24: a time period spanning between 1964 and 1969. Even if legal injury is assumed to have occurred when the last new Model 24 was delivered on April 27, 1979, this date is well beyond the two-year limitations period.[4] Exemplifying this Court's finding that the Plaintiffs' cause of action accrued no later than 1979—before the FAA's issuance of the AD arguably acerbated the invasion of the Plaintiffs' legally protected interests, if any—is the case of *Quinn v. Press*, 135 Tex. 60, 140 S.W.2d 438 (1940).

In *Quinn,* the plaintiff alleged that she had been induced to make a loan based on the fraudulent or negligent representation of her defendant-agent. *Id.* 140 S.W.2d at 438. The defendant had represented that the properties were adequate security when they were in fact valueless. The Texas Supreme Court reversed the court of appeals, holding that the trial correctly rendered judgment for the defendant based on the jury's limitation findings. *Id.* at 441. The court held that the plaintiff's legal injury occurred when she was induced to make the loan and, upon the discovery of the fraud, her cause of action began to

---

3. *See Daitom, Inc. v. Pennwalt Corp.,* 741 F.2d 1569, 1580–82 (10th Cir.1984) (district court's summary judgment ruling against plaintiff affirmed where alleged damages from negligent design and manufacture claims consisted entirely of economic losses).

In *Agristor Leasing v. Meuli,* 634 F.Supp. 1208, 1216–18 (D.Kan.1986), a case decided under Kansas law, a defendant farmer filed a third-party action against the manufacturer of a grain silo for damages resulting from an allegedly defective silo that caused spoilage of the farmer's crops and failure to gain weight in this cattle. After acknowledging that, under Kansas law, economic losses are not recoverable under *any* theory, the *Meuli* court granted the silo manufacturer's motion for summary judgment on counts of both strict liability and negligence. *Id.* at 1217–18.

4. The Plaintiffs' belated attempt to plead more recent deceptive conduct which appeared in their Second Amended Complaint is of no avail. In it, four Plaintiffs alleged deceptive acts by Learjet under the DTPA in 1974, 1981, 1983, and 1984. Both Plaintiffs' Original and First

Amended Complaints alleged that Learjet's tortious conduct occurred during the period from 1966 through 1969.

The language of Rule 15(c) is clear: An amendment "relates back" only if the claim asserted in the amendment "arose out of the conduct, transaction, or occurrence set forth" in the original pleading. Plaintiff's Original Complaint was based on conduct which led to the allegedly unwarranted certification of the Model 24 and ultimately to the issuance of the airworthiness directive that is the subject of this litigation. The amendment was based on conduct between Learjet and four specific Plaintiffs regarding their purchase of aircraft during a completely different timeframe. Such an "amendment" cannot relate back to the Original Complaint. Because the amendment was filed more than two years from the date of the AD issuance, the named DTPA claims are time barred. Moreover, even if amendment did relate back, the Court has already dismissed the Plaintiffs' DTPA claims as a result of its choice of law determination in this case. The law of Kansas applies, and thus Texas' DTPA has no application.

accrue, not when she foreclosed the lien to discover that the security was inadequate. *Id.* at 440–41. The action accrued when the tortious acts of the defendant invaded a legally protectable interest of the plaintiff, although her injury might then have been slight or more definitively ascertainable at a later time.

Similarly, here, if Learjet committed the tortious acts the Plaintiffs allege, these acts clearly would have been "unlawful" and would have created an immediate right of action to the initial purchasers of the Model 24's. The Plaintiffs' cause of action was not dependent upon the subsequent issuance of AD 84–17–02 by the FAA. The AD's issuance was a peripheral, independent action on the part of the FAA, a governmental agency performing a regulatory function to ensure flight safety for the public. As in *Quinn*, when the alleged defects and misrepresentations occurred, and upon their discovery by the original owners or the Plaintiffs, this cause of action began to accrue. A requirement that the *FAA* discover the alleged defects or misrepresentations in the certification process is simply not relevant to the legal injury analysis, no matter how greater specified were the Plaintiffs' alleged damages or more substantiated their claims because of the FAA investigation.

The Plaintiffs' argument that their legal injury did not occur until compliance with the AD was mandatory is unpersuasive. While an FAA investigation into any wrongdoing on Learjet's part during the certification process was certainly beneficial to the Plaintiffs' cause, the investigation had absolutely no effect on whether the unlawful conduct had actually occurred, only on whether it might be discovered by a class of ostensibly unsuspecting owners and operators: the Plaintiffs. The allegedly harmful conduct which affected their economic interests began almost two decades before the AD's issuance. If the Plaintiffs were somehow unable to discover their legal injury, the Learjet Series 20 Special Certification Review procedures, which were initiated by the FAA as early as 1980, provided an adequate and reasonable means to do so as early as 1981 when SCR's report was made public, five years before this lawsuit was filed.

### 3. The Application of the Discovery Rule

■ The determination of when the Plaintiffs' legal injury occurred is only a part of the relevant limitations-defense inquiry. The "discovery rule" may prevent a limitations period from accruing until the plaintiffs discovered, or reasonably should have discovered, their legal injury. *See Hays v. Hall,* 488 S.W.2d 412, 413–14 (Tex. 1973). An analysis of the discovery rule addresses the gap between the injury and the aggrieved party's knowledge of that injury.

Here, the date on which Plaintiffs discovered, or should have reasonably discovered, the alleged design defects and misrepresentations does not involve an exhaustive examination of each Plaintiff's knowledge or efforts of inquiry to obtain such knowledge. On June 13, 1983, a notice of Proposed Rulemaking was published in the Federal Register. The notice of the proposed AD read in pertinent part:

> The Gates Learjet Special Certification Review (SCR) was initiated in June 1980, after several unexplained accidents occurred on the Model 25 series airplanes earlier that year.... The initial effort in providing hardware changes was concentrated on the Model 25 series airplanes. Gates Learjet has now developed similar kits for the Model 24 series and the proposed AD requires installation of these kits.
>
> . . . .
>
> ... It will take approximately 375 manhours per airplane to accomplish the required action, and the average labor cost will be $34 per hour. Modification kit cost is estimated at $13,600 per airplane. The loss associated with two weeks of down time is estimated to be $7,000.

48 Fed.Reg. 27087.

Again assuming, without deciding, that the discovery rule is to be applied to the accrual of the limitations period applicable in this case, the publication of the notice of

the proposed AD on June 13, 1983, gave the Plaintiffs notice of the alleged risk of harm to their economic interests. Assuming that the discovery rule is applicable in this case and that publication of the proposed AD was *legal* notice to Model 24 owners and operators, the Plaintiffs' negligence and fraud are time barred since this action was not filed until October 3, 1986, more than a year after the limitations period had expired. If the June 13, 1983 notice was not sufficient to put Learjet on legal notice, then, when the AD was published in the Federal Register on September 6, 1984, a specific and concrete event occurred which conclusively showed the plaintiffs that their economic interests would be injured by mandatory compliance with the AD. Even if the issuance date of the AD marks the accrual of the limitations period, this action is still time-barred because it was not filed within two years of the AD's September 6, 1984 publication as a final rule.

For the purpose of applying the discovery rule to the facts of this case, the selection of the notice (June 13, 1983) or final publication (September 6, 1984) dates as the point in which the Plaintiffs discovered, or should have discovered, their legal injury is entirely consistent with the caselaw of other circuits and Texas.

In *Crigler v. Cessna Aircraft*, 830 F.2d 169, 170 (11th Cir.1987), the Eleventh Circuit Court of Appeals affirmed the district court's grant of defendant's motion for summary judgment on the plaintiff's fraud action against an engine manufacturer and an aircraft manufacturer. The court found legal notice and a limitations bar when the engine stalling problems the plaintiff complained of were the subject matter of an AD issued five years before his lawsuit

was filed. "Ad's are published in the Federal Register; and, as mandatory agency rules and regulations, publication therein acts as legal notice to owners and operators." *Id.* at 171.

Similarly, in *Mooney v. Harlin*, 622 S.W. 2d 83, 85 (Tex.1981), the Texas Supreme Court affirmed the trial court's grant of the defendant's summary judgment motion on the plaintiff's fraud action. The plaintiff alleged that she was defrauded by a testator's last minute revocation of a bequest to her. *Id.* at 84. The plaintiff's lawsuit, however, was filed over four years after the testator's will had been admitted to probate. The court held that the two-year limitations period began to accrue when, through an exercise of ordinary diligence, the plaintiff could have discovered the fraud allegedly perpetrated upon her. *Id.* at 85. In *Mooney*, limitations started accruing when the plaintiff by examining public records could have discovered that no bequest had been made to her.

As the *Crigler* and *Mooney* decisions demonstrate, an irrebuttable presumption of actual notice arises when constructive notice occurs. Because the legal injury of any Plaintiff could have occurred no later than the Learjet's last delivery of a new Model 24 on April 27, 1979 and because any such legal injury was discoverable through the exercise of ordinary diligence no later than the September 6, 1984, when the FAA published AD 84–17–02 as a final rule in the *Federal Register*, the Plaintiffs' filing of this lawsuit on October 4, 1986, establishes that the Plaintiffs' intentional and unintentional tort claims are barred, as a matter of law, by Texas' two-year statute of limitations.[5] This holding promotes society's interest in repose by not requiring Learjet to litigate claims arising from acts

---

5. Learjet delivered no Model 24 after 1979. As to those Plaintiffs who purchased their aircraft from other vendors *after* the AD's issuance as a final rule in 1984, their claim to have standing to bring an action for tort or contract damages can only be described, charitably, as disingenuous. All the Plaintiffs admit that their alleged damages "arise" from the issuance of AD 84–17–02. As to these Plaintiffs' alleged damages only three possibilities exist: they either paid (1) more than fair market value, (2) less than fair market value, or (3) a price equal to fair market value for their aircraft.

If the Plaintiffs paid less than market value or a price equal to fair market value, they have simply suffered no damages. With respect to those Plaintiffs who possibly paid more than fair market value, their damages, if any, resulted from a poorly bargained for aircraft, not from the AD's issuance or any act or omission on Learjet's part. As the Plaintiffs' own damages experts stated, any diminution in value equal to the cost of compliance occurred when the AD was issued. Thus, any diminution in value occurred *before* these Plaintiffs' purchased

or omissions now more than two decades old.

### 4. The Plaintiff's DTPA and Warranty Claims

The Plaintiffs' claims under the DTPA have already been dismissed because the substantive law of Kansas controls this controversy. *See Walker v. Associates Fin. Servs. Corp.*, 588 S.W.2d 416, 417–18 (Tex.Civ.App.—Houston 1979, writ ref'd n.r.e.) (DTPA action barred where the law of Indiana governed the dispute). The Plaintiffs' new DTPA claims raised in their Second Amended Complaint do not change the fact that Kansas law applies to the substantive issues of this case and, thus, bars the application of the DTPA to any claims raised here. Since the Plaintiffs' tort claims are thwarted by limitations, only the Plaintiffs' breach of warranty claims remain. These claims, too, are time-barred.

■ Both Kansas and Texas have adopted the four-year limitations provided by section 2–725 of the Uniform Commercial Code. The pertinent provisions of section 2–725 are:

> A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. *A breach of warranty occurs when tender of delivery is made,* except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is, or should have been, discovered.

K.S.A. § 84–2–725; Tex.Bus. & Com.Code Ann. § 2.725 (Vernon 1968). "Implied warranties relate to the condition, kind, characteristics, suitability, etc. of sold goods at the time of sale; thus the statute of limitations runs from the date of sale." *Safeway Stores, Inc. v. Certainteed Corp.*, 710 S.W.2d 544, 546 (Tex.1986). *See also Fordyce Concrete, Inc. v. Mack Trucks, Inc.*, 535 F.Supp. 118, 119 (D.Kan.1982) (defendant's motion to dismiss granted where the goods were delivered more than four years prior to commencement of action).

their Model 24's and are not compensable in

It is undisputed that Learjet delivered the last new Model 24 on April 27, 1979. Even assuming the Plaintiffs' pleading and summary judgment proof against Learjet demonstrated an implied warranty claim, a claim to recover economic loss from Learjet would have been time barred at least as early as April 27, 1983.

### ORDER

Because Learjet has sustained its summary judgment burden of proof and established that, as a matter of law, all of the Plaintiffs' claims are time-barred by either Texas' two- or four-year statutes of limitation, Learjet's motion for summary judgment is GRANTED. The Plaintiffs' claims of negligence, negligence per se, negligent misrepresentation, breach of warranty, and DTPA violations (raised in their second amended complaint) are DISMISSED with prejudice. The costs of this action are TAXED against the Plaintiffs, jointly and severally.

In light of the foregoing discussion and because the Plaintiffs' motion for leave to file their third amended complaint seeks amendment only to plead punitive damages and attempts to assert no new substantive claims, the motion is MOOT.

It is so Ordered.